Good afternoon. Illinois Appellate Court First District Court is now in session. The Sixth Division, the Honorable Justice Carl Anthony Walker presiding, case number 22-0116, People v. Jimmy Smith. Thank you, Darren. Good afternoon, everyone. I am Justice Carl Anthony Walker. I have with me our presiding justice, Justice Sanjay Taylor, and also Justice Michael B. Hyman. Justice Taylor is with us. He's having some visual problems. He will be able to hear you very well, and you'll be able to hear him. He will be fully participating, but you may or may not be able to see him. I know that he's still working on that, but he's going to also be fully participating in your arguments, and he is our presiding justice. I'm simply taking over because of the issues with his visual problems. We do grant each side 20 minutes, and we'll allow the appellant an opportunity to reserve time for rebuttal. The appellant attorney can tell us that at one point, but what we'd like to do first is to have each of you two please introduce yourselves. Good morning, Your Honor. Mike Ornstein, State Appellate Defender for Defendant Appellant Jimmy Smith. Okay, thank you, Mr. Ornstein. Mr. Ornstein, did you want to save any time for rebuttal of your 20 minutes? Yes, five minutes, please. Five minutes, okay. Mr. Levin, I assume since your camera is on, that you are giving... Yes, good afternoon, Your Honor. Eric Levin, Assistant Attorney General Eric Levin on behalf of the people. Thank you, Mr. Levin. And Mr. Ornstein, when you're ready, you can go ahead and get started. Thank you, Your Honors. Your Honors, my client must... This court must reverse Mr. Smith's conviction because he did not procure, quote-unquote, a hitman. He was charged with solicitation of murder for hire. This offense requires that the accused procure someone, quote, to commit, unquote, that offense, i.e. first-degree murder. Well, when you say procure, Mr. Ornstein, procure is to basically find somebody. Would you agree? Procure is to get what you want, is what I would say. That is the definition of procuring. He to have been found guilty, that he needs to have not only procured the person, but they would have had to have carried out the act. That's what it sounds like you're arguing. No, I'm not saying that. I'm saying that you could read the statute that way, but I think you could also read the statute as saying that procure someone to commit the murder is procure someone who is going to commit the murder. You could read it either way. Now, there is some support, sort of contextual support for what you're saying. First, to commit the murder because the minimum sentence is 20 years, just like the minimum sentence for murder, but I think probably the more reasonable reading is to procure someone to commit the offense is someone who's going to commit that offense. I'm sorry. Go ahead. Go ahead. Because what you argue here is you seem to make an argument in your brief that there's an exception for a law enforcement officer, that where there's a law enforcement officer involved, there can't really be an intent to commit the crime. Therefore, he didn't procure it. That's what I found you arguing. I guess I'm not saying that. If he found someone who is not a law enforcement officer and he said, would you commit a murder for me? The person said no, and the person is not a law enforcement officer, that would not be procuring either because he did not get somebody or procure somebody to commit the offense of first degree murder. Now, it is solicitation of murder. It is that offense where all you have to do is ask somebody, and that statute does not require the word procure, but solicitation of murder for hire requires procurement. It doesn't matter if it's law enforcement. You're not saying it doesn't simply require a promise to give something. It seems like that once you promise to give them something, it doesn't matter whether it's law enforcement, because it could be a real law enforcement officer that's really willing to commit the murder. Could be, right? Theoretically, it could be. I think on these facts, no one would say that it is, and no rational fact finder could say that it is. Theoretically, if you found a law, there have been corrupt law enforcement officers in Chicago's history from time to time. If the law enforcement officer, if the circumstantial evidence shows that he was a person who was going to do that, then you could certainly be convicted of this offense. Mr. Orenstein, this is Justice Taylor. My apologies for my video. Let's say the defendant here had entered into some agreement with a fraudster, that is someone who had no intent on actually carrying out what the defendant wanted, but was just looking to get the money and take off. Under your theory, that would not be a murder for hire, correct? It would be solicitation of murder, but not murder for hire. That is absolutely correct. This is essentially a fraud. It was a legal fraud, or it was a dishonesty. The undercover officer was pretending to be someone who was not, so I don't see a distinction between a law enforcement officer and what you're describing. In Bretton, B-R-E-T-O-N, the court said, quote, procurement of another to commit murder, and I'm omitting a few words, where a defendant agrees with a government agent feigning agreement is sufficient to support a conviction of solicitation of murder for hire. It does say that. Unquote. How do you get around that case? How I get around that is by everything that preceded it in Bretton. In Bretton, the defendant framed the issue. Defendant first contends that the conviction must reverse because the state failed to prove the, quote, agreement element. Then the court framed the issue the same way. They started out saying, we have found no previous case concerning the term, construing the term agreement. Then they said, the issue in this case involves the, quote, agreement, unquote, between the defendant and Callahan, an undercover government agent. Finally, it framed a narrower question. The question is whether conspiracy law and the bilateral theory of conspiracy should apply to the solicitation of murder for hire statute to require a bilateral agreement when the solicitation is pursuant to an agreement. Then it can distinguish the conspiracy agreement from the agreement in this statute. I would say that when the court is saying that, the court is doing what it framed itself to do, which was to construe the word agreement in the murder for hire statute. There is this language you're quoting, but I would say that that's like the ultimate example because it's something that wasn't disputed. No one ever addressed the definition of the word procure in Bretton. That would be my answer. Okay, so let's go back a few steps. Yeah, yeah. Okay, so on page 17 of your brief, you cite Avery v. State Farm, which quotes another Supreme Court case saying that opinions respond to the issues before the court and must be read in light of those issues, which is basically what you just said. So you agree with that? Yeah. Okay, so you agree with that proposition. That's the way it framed it, yes. Yes, so let's look at the cases that you cite in order to get to your definition of procure. All right. You have a singular definition. First, you cite a pornography case. Now, a pornography case, the issue is quite different than the issue in a solicitation for murder case. They're trying to procure illegal material for dissemination, and if they don't procure it, they don't get it, then it does not come under the statute that was discussed in that particular case that you cite. Right. That would be an attempt to solicit and be under a different statute. So in that case, that does not comport with our situation here. It's a different situation. Would you agree? It's a different situation, but I don't think that means it's... Well, it's a different situation. So there, your word to get makes sense. I agree. Okay, so it's to get, right? Right. It's to get something you want. Hold on. Let's go to the other case you'd cite. It's an insurance case, right? And it talks about how agents procure for a client. They procure insurance. They get insurance. Right. But agree, in that case, under the issue in that case, procure would mean to get. Procure means to get. That's correct. Okay, so let's go to our situation. Now, one of the ways we can try to define this, what does procure mean, is to look at the pattern criminal jury instructions under 6.01, definition of solicitation other than solicitation of murder or solicitation of murder for hire, but it talks about commands, encourages, requests. Nothing like get. That's true, but in the statute, the commands, encourages, regrets is right there in the statute. That's one element. This is another element. So unless commands, encourages, unless procure has no meaning, then the IPI must not be getting it correct. What about, I looked at the dictionaries you cite. Right. Dictionaries have more than one definition of procure. One of them is to get, yes, but there are several dictionaries, including the ones you cite, that have other definitions, and that is to cause, to instigate, which is different. So in this case, we are talking about soliciting, which is instigating. They want to cause a murder. It doesn't say that they have to, it's not the intent, as you know, you would agree the intent of the solicited individual is not involved here at all, right? You have to concede that. The intent of the solicited individual is not part of the statute. It's never been interpreted that way. I know, I would not concede that. Give me a case. I would not concede that. I would not concede that. Okay, give me a case. I don't have a case. There isn't any case. They all talk about the intent of the defendant who solicited. The case law is replete all over the country with regard to this issue, that it is the intent. In fact, the statute says the intent of the offender, right? On what basis are you not going to concede that? I'm not going to concede that because if procure means to get, now it might mean something totally different, but if procure means to get, then it means getting something. He did not want an undercover officer, so if that's what he got, he did not got what he was trying to get. But that's not to say, what you're doing is you're trying to put a square peg in a round hole because you won't concede. I thought you conceded that there are other definitions as ordinary meaning of what procure means, and it depends on the statute and what the issue is. And in here, the issue are trying to create something. They're trying to instigate something, and the person in the on the crime that has been defined. I don't agree with that. Let me give you an example. Let's say I'm a psychologist or a journalist, and I want to interview a crazy person or a person who is a pathological liar. If I want to procure that person, I can't procure that person without getting someone who has that mental state. So procuring something can subsume the mental state of the other person. We're not talking about a journalist. I mean, you can make up a thousand types of hypotheticals that have nothing to do with the facts of this case. But let's talk about the statute. If you're trying to find somebody who has a mental illness, then find somebody with a mental illness. But we're not talking about that here. We're talking about the statute, okay? Let's not take hypotheticals that have nothing to do with this case. So what I'm saying is, to make it very clear to you, is that you have on one of several definitions of the word procure. And if you look at the dictionaries, you'll see there are several, including one that we don't need to talk about, is procuring for sexual relations. But that's only one of several. And this word has been around, I looked it up, for hundreds, thousands of years, I think almost. I think it comes up in the Latin. So what you have to realize is that you have created a false premise. That is, you have said it only means to get. And if it means to get, then you win. But if it doesn't mean to get under the circumstances of this particular statute, then since we're not looking at who solicited, it only makes sense that it is the idea of instigating, arranging for something. That's the crime. And that's what the crime has been interpreted in every case I read, on this, whether it's an Illinois case or not an Illinois case. That's why you can't tell me any case that doesn't say that. I don't think any case has seriously looked at the definitions of the word procure, any Illinois case at least. And I think a lot of your definition of procure, because you like to get, when there's other definitions that under the ordinary use of that term, under the circumstances at issue in this case, would lead one to a different interpretation of that, where you would agree that words in English can have many meanings, correct? Words in English can have many meanings, but instigate doesn't make any sense in this context. Procuring another, I mean, if you're going to instigate another to commit murder, that's sort of the same thing. You need someone who's going to commit a murder, not someone who's going to lie about it. No, you don't. You're not looking, we're not, again, we're not looking at anything in the mind of that person. That's why for years and years, as you know, people have not committed murders, but have been approached and they will go to the police as occurred here. Somebody said that this man wants to murder two individuals. And he went to authorities and they set this up. And that's how they usually avoid a murder. So that's why, otherwise, what you're saying is, oh, they shouldn't have done that because that means that he didn't solicit. And so this would become a crime that only is actually effectuated if the person really wants to, who's been approached, is going to do the deed. So, but that's not what the cases say. And if you can't give me one case, I mean, you know, again, we have to look at precedent. We have to look at what's been going on for the last hundred years with regard to this type of crime. And you can't give me one case anywhere that would come out with your theory. All right. That is true. I think the state certainly has not come up with any that addresses the word procure. It always addresses the word agreement. That's what Bretton says. No, no, no, no, no, no, no. But that goes to what you just said. Agreement. We're not talking about agreement here. There's other things. You don't have to agree, right? There's several words that are used in place of agreement, like giving something of value is another word, which we know. So, you know, you are changing the, you always want to change what you were talking about. Procure is the word we're talking about. And I do have a case. And that case is Bretton is doesn't decide what procure means, but it understands what I mean. And so does every other case that's ever been involved in this situation. So you just brought something up. You say definition is one when there's definitions two, three, four, and five. And you say, oh, we can only go to one. Well, but that's not true under the circumstances of the issue. And that's why I started out with the Nix versus Smith. Okay. So, but I think under any definition that my client did not procure. If it's instigated, my client did not instigate someone to commit first degree murder because he was not good. The officer was not going to commit first degree murder. If you define it as. Hey, wait, wait, wait, wait, wait. That's not the crime. Don't change the crime. It doesn't matter what the officer did. It only matters what's in the mind of the defendant, right? Let's stop there. Let's not, not don't talk about the person who's approached you. You keep going there. That's not the crime. That's right. Mr. Ornstein, assume that it's someone, not a police officer who is offered the motorcycle value to $5,000 to commit this crime. Then why do you think that's something different that if that, because you don't know if that person intends to do it. Because the harm, because one, because it seems to be enough just that the defendant offered the, that's something of value in this case, being in this motorcycle valued at $5,000. Right. So I, I'm sorry, can you repeat the question again? I got the last one. My question, my question for you is to tell us what we're missing. You, it seems that you believe we're missing something. And our, the concern that, that we're, we're raising here, that Justice Hyman has just discussed with you is this whole something for value that's being offered. In this case, we're talking about a motorcycle valued at $5,000 offered to this person that happens to be a police officer. But let's assume for a second, the person was not a police officer and that person still had no intent on ever committing the murder. Your position would be that your client could never be charged or found guilty of this. Not of this particular crime, of many other crimes, but not of this particular crime. Yes. Just because, just because the person had no intent of ever committing the murder. Yeah. That's what we're saying because, because, because. Mr. Ornstein, how about just hypothetical? What if your client had entered into an agreement with a third party who had every intent on carrying out what your client wanted, but then. I'm sorry, Your Honor, can you speak up a little louder? I'm getting some of your words, but not all of them. Sure. Let's assume that your client had entered into an agreement with a third party, not a police officer who had every intent on carrying out what your client wanted, but then he had second thoughts and decided, eh, I don't think I'm going to do it. You know, what about that? Did he, did your client procure somebody? Yes. Why? So, so because why? He initially wanted to do it. Because he got somebody who was going to do it. And the fact that he changed his mind down the road doesn't matter? Yes. He, he, he was, he got someone who was going to do it. That's why. Well, where did he get that? But that, that's my point. And you, you, you still won't answer my question. You're talking about the intent of the solicited individual, right? Right. Where is that in the statute? Give me one case that says that that's relevant. One. Well, you're asking two questions. First of all, you're asking one case. I don't have a case. The question is, where is it in the statute? Is it's in the definition of the, it's in the nature of the word procure. You get. Only, only, but only if it's to get, if it's any, if it's my, if it's the other definitions, which are ordinary under this statute, as I said, we would, it's different than the pornography statute. It's different than the insurance statute. In cases say that words have ordinary meaning in light of the issues and the issue here, it's called solicitation for murder. That's the issue, right? Don't, don't read out the word solicitation. That's the name of this crime, right? Solicitation is a name, but it's not an element. It's not. They use the word procure and it's, and it's not past tense in your brief. Every time you use a word, you use the past tense. Procured with a D the statutes is, has the S it's, it's, it's present tense. It's future tense. It's every tense, but you say it has to be procured. No, the statutes is procured. You're right. But it's hard to say that. I mean, it's hard to use that definite tense when you're writing a brief. That's right. But that's not the, that the statute is written so that it's a continuing thing. Procures doesn't mean, well, if it's past tense, that's how you go to the fact. Well, it's past tense, right? Because getting into the mind of the person solicited, there is nothing in the statute. There's that one case again, you can't cite me a case. If you could cite us a case, tell us otherwise, how can we possibly, I mean, how does your argument make any sense? We'd be making new law contrary to everything that's ever been stated about this statute. We'd be saying that you have to look at the D solicited individual's state of mind. First of all, I would say that if it was as cut and dry as you're saying justice, that the Illinois Supreme Court would not have taken our PLA on the same, on the same issue about six months ago. That's the first thing. Well, that's, that's something totally different. But what I do want you to do, Mr. Ornstein, is that you're running out of time, and I know that there's three other issues that you may want to get to those really quickly. Okay, thank you. Okay, so, so, so the other issue I'd like to get to get to is the, give me one sec, is the eavesdropping. And so, Your Honor, the record shows that the state's eavesdropping was unauthorized. Normally, the ASAs are automatically authorized to do their jobs. They can file motions, seek subpoenas, approve charges. But eavesdropping is different. Eavesdropping is specifically restricted in our Constitution, this Article 1, Section 6. And eavesdropping requests are specifically restricted by the Code of Criminal Procedure. Under 108A, they must be authorized by, the ASAs must be authorized by the state's attorney. Under the State Software of Proof, the state's attorney, Anita Alvarez, never authorized ASA Golda to do anything. Mr. Ornstein, I thought you conceded, I thought you conceded the error of that argument. Oh, I absolutely did not concede. I conceded, I, there were two grounds in the opening brief. The first, the first ground was a transcript from, from Alvarez, and the second was the State Software of Proof. I conceded the first part of it. The State Software of Proof, taken as true, shows that ASA Golda never got authorization from Alvarez. You want to go to your next, our next argument? So, I, that, those are the two I was prepared to argue. I mean, obviously, the crankle issue, the state has conceded on, and we'd ask that the crank, there be a crankle remand. Okay, and did you want to argue anything about the other questions? I'd ask that you grant the relief we sought. Sure, and you still have five minutes for rebuttal, Mr. Ornstein. Thank you. You're welcome. Mr. Levin? Thank you, Your Honor. Excuse me, again, Assistant Attorney General Eric Levin, on behalf of the people. A person is guilty of solicitation of murder for hire when, with the intent that a first-degree murder be committed, he procures another to commit that offense pursuant to an agreement or understanding or contract. Well, but, Mr. Levin, Mr. Ornstein's argument is that no one was ever procured. Correct, Your Honor. I think, as, as some of the questions we're getting at here, I think this is relying on an overly cramped reading or definition of the word procure that takes that word completely out of the context of the statute, which, that it's found in. And I, I think here, Bretton, in 1992, Bretton held, the Second District held, and I'm quoting here from 362 of the opinion, the solicitation of murder for hire statute does not require actual agreement between a defendant and another. So unlike, what Bretton is recognizing is that unlike conspiracy, which does require an agreement between one or more persons, solicitation of murder focuses entirely on the acts and the intent of the defendant, not of the person who solicited. So the question here is, what did the defendant do? How did he do it? And what was his intent when he did it? And here, the evidence established, I don't think there's any dispute about this, that the defendant asked a man who he believed was a hit man, to kill two people. He promised him a $5,000 motorcycle in exchange. And he did all of that with the intent that two first degree murders be committed. That's all the solicitation of murder for hire statute requires. Why is the word procure in the statute? What does procure add that we have to look at? I think the reason for the word procure in the for hire statute and not in the ordinary solicitation statute has to do with the additional element of the money or something of value. So it's not simply asking or encouraging somebody to commit murder the way ordinary solicitation does, but it's getting that person, getting somebody to commit a murder, arranging for this murder, pursuant to some agreement for money. So it's the legislature. But it doesn't have to have money, but there has to be money. Does it? Or is that a requirement? I thought it was just, if they have an agreement, you wanted to do it for nothing, you just agreed, I'll go. My reading of the statute is that it must be pursuant to any contract, agreement, understanding, command, or request for money or something of value. So it's essentially the legislature recognizing that this is a more serious offense than just simple solicitation of murder. It's one thing to ask or encourage or request somebody to commit murder. It's something entirely different to now promise them money or a $5,000 motorcycle or what have you to do it. It's perfectly reasonable for the General Assembly to think this is a more serious offense. You've now made it more likely that a murder will be committed. You've engaged in more culpable conduct. And so you've committed a more serious offense. And as you say, Justice Hyman, this is sort of the, it's been the universal recognition of what solicitation requires. And more specifically, it's been the law in Illinois since at least 1992 when Bretton interpreted the solicitation of murder for higher statute to require only what it called unilateral agreement, meaning... What's your response though to the argument that Bretton did not discuss the word procure? Well, I think that's just not the case. I think Justice Taylor quoted the language from Bretton where they do mention the word procure. And I would say even beyond that, more specifically, their holding was that unlike the conspiracy statute, which does require bilateral agreement, the solicitation of murder for higher statute requires only a unilateral agreement. So regardless of what particular word they were focused on, their holding was with respect to the statute as a whole. That's a case that interpreted this statute more than 33 years ago. The legislature has been free at any time since then to amend the statute if it thought that Bretton got it wrong. It has acquiesced in that definition for 33 years, and there's no sound reason for this court at this time to chart a different course. Mr. Levin, what's your response to Mr. Ornstein's argument though that this being a law enforcement officer makes this different? I don't see how that's the case. Again, if it were conspiracy, absolutely it would make for a difference because you can't commit a conspiracy with an undercover law enforcement officer. But this is solicitation. This statute focuses on what the defendant did, how he did it, i.e. getting his intent, but he did so with the intent that murders be committed. It says nothing about the other person's intent. It says nothing about the other person's actions. The defendant's interpretation would essentially collapse the solicitation of murder for hire statute into the conspiracy statute and essentially make it that if we had... Essentially the only way to show that the solicited person actually intends to go ahead and commit this murder is if he does some outward act in furtherance of it. We can't get into his head. This is not a case where we're proving intent after the fact. Generally, we say that we can infer intent from action. If somebody does something, we can then prove that they intended to do it. But here we're talking about, does somebody intend to do something in the future? It's almost impossible, unless we could hook up a machine to the other person's brain to know whether they truly intend to commit this murder, which is precisely why the conspiracy statute does require at least some overt act in furtherance of that conspiracy. But again, as I say, to interpret the solicitation of murder for hire statute to similarly require a bilateral agreement would make the two statutes almost entirely overlapped. And that could not have been what the General Assembly intended. Do you agree that if we rule in favor of Mr. Ornstein on this argument, that that would mean that sting operations would no longer be available in situations such as solicitation for murder? They would be available for ordinary solicitation of murder. But I don't understand Mr. Ornstein's argument to, I understand him to concede that his client's convictions for ordinary solicitation are at least with putting aside his other arguments. But I think it would absolutely be the case that the people could never convict somebody of solicitation of murder for hire if the solicited person, and the statute also uses that word in the sentencing provision, the solicited person, if the solicited person was an undercover officer. But even beyond that, I mean, how would the people ever prove that even a legitimate hitman didn't intend here to just pocket the money and run? We need to know whether the offense has been committed at the time the defendant commits the actus reus, which is the offering or promising of something of value to get somebody to commit a murder. And his cellmate had asked him, did you get somebody to commit the murder? He would have said yes. And a reasonable person in his shoes would have said yes. They would have understood that he at that moment had procured another to commit a murder pursuant to an agreement for money and that he had done so with the intent that a murder be committed. The fact that, you know, luckily for all of us, this was an undercover officer and not a legitimate hitman is no reason, in no way lessens the culpability of his conduct. So again, I would simply say that, again, this is essentially... So let me turn you to the eavesdropping statute. Is it your position that the pre-1994 version of the eavesdropping statute applies in this case? Yes. And could you walk us through that? Okay. So prior to 1990, at all relevant times, or I should say at all relevant times for our purposes, the statute has prohibited the use of an eavesdropping device to record any conversation without either all parties' consent or prior judicial authorization. What's changed is the for the Illinois Supreme Court interpreted the word conversation in this statute to mean only a conversation or only an oral communication in which the parties had some reasonable expectation of privacy. So they read the statute to not apply or to not prohibit recording in situations where, A, one of the parties to the conversation was doing the recording, or in other instances where parties had no reasonable expectation of privacy. In 1994, the General Assembly disagreed with that interpretation and adopted the broader definition of conversation that basically said, no, we want the statute to apply and to prohibit recording of all communications, regardless of whether the parties have a reasonable expectation of privacy. In March of 2014, about eight months before the issue here, the Illinois Supreme Court held in People v. Clark that that statute, with that definition of conversation, was overbroadened in the First Amendment and invalid. Under generally accepted provisions of principles of law, when a court strikes down a statute like that on its face, the earlier version of the statute comes back into effect and is what applies. So that means that there's still an eavesdropping provision, but it only applies in situations where the recorded conversation is one in which the parties have some reasonable expectation of privacy. And here there's two reasons why a defendant did not have a reasonable expectation of privacy in this conversation. The first is that the person he was having the conversation with, Gutter, had consented and was doing the recording. And even beyond that, this was a conversation that was happening in a jail visiting room, where the defendant himself recognized during the first conversation that there was no reasonable expectation of privacy in that room. He recognized that his conversations were likely being or could be overheard. So the short of it is the people did not even need to get prior judicial authorization here, because under the effect at the time of these recordings, the eavesdropping statute only prohibited recordings without prior judicial authorization if there was a reasonable expectation of privacy in the conversation and there wasn't here. Completely independently of that argument, however, the people did get prior judicial authorization here and it was properly secured. I think the argument here is essentially conflating sections 108A and 108B. 108B, which is what then state's attorney Alvarez and her then first assistant Bolliker were testifying to in that unrelated federal case that the transcript has been submitted here. And there, Alvarez and Bolliker were talking about the office's policy with respect to wiretaps, which are governed by separately by federal law, Title III. And those are the types of recordings that are no party consent. What we're dealing with here is what is generally referred to as a non-consensual overhear. So one of the parties does consent. It's not in any way prohibited or limited by federal law. It's Illinois law, however, does require prior judicial authorization, at least at the time there was a reasonable expectation of privacy. And 108A says that the law enforcement officer can submit an application. That's what happened here. Officer Raher submitted an application. The application has to be approved by either the state's attorney or an assistant state's attorney with the state's attorney's authority. Here, that's exactly what happened. The application that was submitted included a section signed by ASA Golding, where he informed the court as an officer of the court with an obligation to be truthful. He informed the court that he was signing off on this by the authority and consent of state's attorney Alvarez. There is absolutely nothing in the record that contradicts that assertion by ASA Golding. In fact, what is in the record confirms it. The offer of proof that we made in the trial court, which is that as a deputy in the Special Prosecutions Bureau, it was the longstanding policy of the office to give authority to ASAs in his position. So we have the offer of proof confirming the application. Even if we didn't, the only evidence in the record is his assertion in the application, which is not contradicted, which he had an obligation to be truthful when making, saying that he had been authorized by the state's attorney to sign off on these applications, which is exactly what he did. So, Mr. Lehman, one follow-up question. You had indicated that the eavesdropping statute that was in effect prior to 1994 turns on whether there's a reasonable expectation of privacy. And then you said that because the conversations took place in the jail's visiting room, there could not be a reasonable expectation of privacy. But I thought the case law was that if there's no expectation of privacy when a party to a conversation makes a recording of that conversation. So it really doesn't matter whether he was in the jail's visiting room, right? Absolutely. You're absolutely correct. And I'm sorry if I sort of conflated those two things. I think in the brief, I may hopefully made the point more clearly. The main argument here is the mere fact that one of the participants in this conversation, Officer Gutter, consented to the recording, eliminated any reasonable expectation of privacy in the conversation. I believe that was the holding of either Beardsley or Harrington, Illinois Supreme Court cases, which we cite in our brief, that had interpreted the statute pre-1994. Sort of as icing on the cake is the fact that even if this had been some third party doing the recording, the fact that it was taking place in a jail visiting room independently eliminated any reasonable expectation of privacy. But the important point here is that the fact that Gutter was doing the recording eliminated defendant's expectation of privacy. We understand that, Mr. Levin. You're actually almost out of time here. You actually are out of time. So did you want to address quickly that the other two issues? I know you've already conceded on the Krenkel issue, but the key aspect of the alleged errors, do you want to address that? Well, just very briefly, I think we do in the brief, we go through each error and the defendant has not established any of these asserted errors. They're all forfeited. He has not asserted that are clear or obvious errors. The people did not rely on any post-arrest silence. They relied on a post-arrest inconsistent statement, which was perfectly proper. The admission of his prior convictions as impeachment evidence was extremely probative because essentially the case boiled down to the credibility of his testimony. So his prior convictions were extremely probative. Any potential prejudice was ameliorated by the fact that the jury did not hear the underlying facts of those convictions and was given a limiting instruction on how to consider them. The other comments that defendant cites about ASA Papa's state of mind, or I'm forgetting some of the issues here, but none of them rose to the level that would have been preserved for review. But the important point here is that they're all forfeited and defendant can only prevail if he shows that the evidence was so closely balanced that these errors threatened to tip the scales of justice against him. And the evidence here was far from closely balanced. It was overwhelming. The jury heard the defendant in his own words, in those recordings with officer Judge Lynn and gave him suggestions on how to dispose of the body, offered him a $5,000 motorcycle in exchange. And against all of that, we simply had his or defendant's frankly unbelievable testimony that no, this had all been a fake murder for hire plot, which itself was contradicted by the fact that that's not what he told officer Mendez after his arrest when he claimed to not even remember meeting with Gutter. That's not what he told Judge Lynn at the first court appearance after he had made the promise to Gutter when he told Judge Lynn, I couldn't get you, suggesting that he yes, indeed did intend for the murder. So again, the evidence is not- Mr. Levin, I'm going to have to cut you off there. You're actually way over time now. I'm sorry, your honor. Thank you. No problem. No problem. I allowed you to get to that issue. I think it's important to get to all these issues. Mr. Ornstein, I want to come back to you and you have five minutes. Thank you, your honor. So first I'd like to focus on with the offer of proof, the court. Well, first of all, yeah, offer of proof. The state's proffer with regard, excuse the eavesdropping, consider what it did not say. Instead of the offer of proof, why not get to the issue about which version of the statute applies? Because if Mr. Levin is correct that the pre-1994 version of the statute applies, then your issue about this offer of proof is obviate or moot. Okay. So your honor, when you say the eavesdropping statute, I want to question that framing because there are actually two eavesdropping statutes. There's a criminal eavesdropping statute in the 720s. And then the 720 regulates everybody. 720 regulates only police officers and law enforcement officers. And that's what we're focusing on. Clark invalidated one aspect of the 720s, but the 725, pardon me, says that investigative eavesdropping device use needs a judge's order. And only elected state's attorneys are authorized as he needs can request such an order. So it's Clark, has nothing to do with this case. And we're not, nothing we have to say has to do with the 720. That would be my answer to that. So going on to the offer of proof that Mr. Levin was talking about, consider what it did not say. It did not say that Oliver has ever authorized Golden to do anything. It did not say that Anita Oliver has ever even talked to Golden. And it did not say that she ever endorsed the supposed policy. Rather it described a game of telephone where someone we don't know said something decades ago and it got passed down as office lore, eventually reaching ASA Golden. As the state press points out, we assume that what ASA Golden said is true. And if Anita Oliver is either verbally or in writing had ever said you're authorized, there's no question that that would have been the offer of proof because it would be very logical for the state to put that in the offer of proof. So we're arguing is that the proof taken is true shows that there is no authorization as the statute requires. So unless there are any other questions, I would ask this court to reverse my client's conviction and order a new trial and the crinkle hearing. Okay. Are there any other questions, Justices? No. All right. Mr. Ornstein, Mr. Levin, we thank you both for your excellent argument here today. And we do appreciate excellence. So thank you to both of you. Have a good day.